UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IATRIC SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> HAMILTON HEALTH SCIENCES CORP., <br><br> Defendant. | Civil Action No. 1:24-cv-13116-NMG |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT HAMILTON HEALTH SECIENCES CORP.'S
PARTIAL MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER RULE 12(b)(6)**

Plaintiff Iatric Systems, Inc. ("Iatric" or "Plaintiff") hereby submits this Opposition (the "Opposition") to Defendant Hamilton Health Sciences Corp.'s ("HHS" or "Defendant") "Partial Motion to Dismiss Plaintiff's Complaint Under Rule 12(b)(6)" (dated February 7, 2025) (the "Motion") and accompanying Memorandum of Law of the same date (the "Memorandum of Law"). For the reasons set forth in this Opposition, the Court should deny Defendant's Motion.

**INTRODUCTION**

Defendant filed an Answer (dated February 7, 2025) in response to Count I of Plaintiff's Complaint (dated December 19, 2024) for breach of contract. Defendant thus conceded that Plaintiff had set forth a contractual claim. This case, accordingly, will remain on the Court's docket after a ruling on the Motion.

The only issue now before the Court is whether Plaintiff has pled sufficient facts concerning its claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count II) and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), M.G.L. ch. 93, § 42 (Count III),

1

as well as for common law misappropriation of confidential and proprietary information (Count IV).  Plaintiff has met the liberal pleading standard that is relevant here.

Iatric's statutory misappropriation of trade secrets claims are adequately pled, and its common law misappropriation of confidential information claim is not barred by the economic loss rule.  Further, to the extent this Court were to find that Plaintiff's claims are inadequate (which they are not), this Court should afford Iatric leave to amend its pleading.

## FACTS

The following facts are derived from Plaintiff's Complaint and contracts referenced therein, namely, the 2007 Software Product Master License Agreement ("MLA") and subsequent 2017 Addendum ("Addendum").[1]  These written instruments are attached as exhibits to the Declaration of Michelle Leafloor (dated February 7, 2025) ("Leafloor Decl."), which Defendant has filed with the Court.

## The Parties

There are two (2) parties to this litigation: Iatric and HHS.

Iatric is a healthcare IT company that provides technology solutions to hospitals and hospital systems to optimize electronic health records, connect with other systems, protect their patients and data from cyber threats, monitor patient privacy and detect suspicious activity, and improve database security.  Compl. ¶ 7.  HHS is one of Iatric's clients and is comprised of a network of nine hospitals, a cancer center, a rehabilitation facility, and an urgent care facility serving Hamilton, Ontario, Canada.  *Id.* ¶ 8.

---

[1]   Plaintiff agrees with Defendant that in evaluating Defendant's Motion, this Court should consider the written instruments that are central to and referenced in Plaintiff's Complaint.  As Defendant explained at page 3, footnote 2 of its Memorandum of Law, such consideration is permissible under relevant First Circuit law.

**The MLA**

On or about December 18, 2007, Iatric, as "Licensor", and HHS, as "Licensee", entered into the MLA for Iatric's Medlink software to interface with HHS's electronic health records system. *Id.* ¶ 9. Under the MLA:

> "Software" is the object code, in any form, format, and medium, for the Software Product identified in section 1 of this Agreement or in any Addendum of this Agreement. "Software" also includes any/all related information, documentation, and corrections, modifications, updates or enhancements (collectively, "Updates"), if any, which the Licensor provides to the Licensee during the term of this Agreement.
>
> "Source Code" is the original programming statements and explanatory comments developed or acquired by the Licensor, which, when compiled, produce the basis for the Software.
>
> "Confidential Information of Licensor" includes, but is not limited to, all programming, code, documentation and other written material, methodologies, processes, and inventions of the Licensor, and the terms of this Agreement, including pricing, and any information or material designated by Licensor as confidential. "Confidential Information of Licensee" includes, but is not limited to, Protected Health Information ("PHI"), the Licensee's financial and business information and any information or material designated by Licensee as confidential. Confidential information does not include information that:
>
> i) is or becomes publicly known or available without breach of this Agreement; or
> ii) is received from a third party without breach of any obligation of confidentiality; or
> iii) was previously known by a party as shown by its written records.
>
> "Licensee's Entities" means entities controlled by the Licensee Signatory, and listed on the Cover Page or applicable addenda and expressly excludes any entities that control the Licensee Signatory or are under common control with the Licensee Signatory.

Leafloor Decl., Exhibit B, §§ 2(b), (c), (d), and (e).

The MLA sets forth the contours of the software license. For example, and without limitation:

> The Licensor grants to the Licensee a limited, nonexclusive, nontransferable license to use the Software exclusively on its current Meditech database configuration, MAGIC or Client/Server, at its hospitals and facilities ("Licensed Facilities") and on the databases listed in Attachment 1 to this Agreement or the applicable Addendum ("Licensed Facilities"). The Licensee is prohibited from making copies of the Software except backup. The Licensee agrees that it will not reproduce the Software for any other purpose.
>
> The Licensee Signatory also agrees that it will notify Licensor if the licensed bed count for the Licensed Facilities at which the Licensee is licensed to use the Software changes and/or the Licensee acquires or adds additional hospitals, facilities or databases beyond that which is described in Attachment 1 to this Agreement or any Addendum. At the sole discretion of the Licensor, the Licensee Signatory agrees to pay, at the then current rate, additional fees if the Licensee wishes to add hospitals, facilities and/or databases to its License, or if the licensed bed count increases, and the applicable Attachment 1 will be amended in writing accordingly.

Leafloor Decl., Exhibit B, §§ 4(a) and (b). Notably, Attachment 1 to the MLA has only one (1) facility listed on it: "Hamilton Health Sciences." *See id.* Attachment 1.

As part of this written instrument, the parties agreed that Iatric owned the intellectual property in question. Section 4(c) of the MLA provides as follows:

> All copyright interest, exclusive rights, title and ownership in and to any/all elements of the Software, whether or not these elements have been published, will remain at all times the exclusive property of the Licensor. The Licensor licenses the use of such elements to the Licensee solely to the extent provided in this Agreement. The Licensee will maintain the integrity of all copyright and trademark notices of the Licensor, or of any third parties, to the Software or to any related documents, and will take no action inconsistent with the copyright and trademark ownership rights of the Licensor or of any third parties. The Licensee shall not assign, transfer, distribute, or sublicense the Software to others without the prior written consent of the Licensor, which may be withheld in Licensor's discretion. Licensor has the right to terminate the license automatically and immediately in the event of any breach of the provisions of this Section 4.

Leafloor Decl., Exhibit B, § 4(c).

Iatric, as part of the MLA, included language to protect its confidential, proprietary information. Section 8 of the MLA requires HHS to hold Iatric's Confidential Information in

4

"strict confidence" and that HHS shall not "directly or indirectly use, disclose, copy, transfer, or allow access to such confidential information . . . ." HHS is further required under the MLA to use "such procedures and mechanisms necessary to maintain the security of and to prevent the unauthorized access to the computer systems on which the Confidential Information resides . . . ."

Section 8(a) of the MLA reads in full as follows:

> Licensor agrees to hold the Confidential Information of Licensee in strict confidence, and except as expressly authorized by the Agreement, not to directly or indirectly use, disclose, copy, transfer, or allow access to such confidential information except as necessary for the purposes of this Agreement. Licensee agrees to hold the Confidential Information of Licensor in strict confidence, and shall not directly or indirectly use, disclose, copy, transfer, or allow access to such confidential information except as necessary to exercise the license granted under this Agreement. Licensee agrees to use, and to require its employees and independent contractors to use, such procedures and mechanisms necessary to maintain the security of and to prevent the unauthorized access to the computer systems on which the Confidential Information resides consistent with its obligations under this Agreement.

Leafloor Decl., Exhibit B, § 8(a).

Consistent with the above, HHS agreed that its obligations to protect and maintain the confidentiality of Iatric's software has a "special value" such that "damages alone in an action at law cannot compensate" Iatric in the event HHS breached its confidentiality obligations. Section 8(b) of the MLA provides as follows:

> The Licensee's obligations to protect and maintain the confidentiality of the Software have a special value, and damages alone in an action at law cannot compensate the Licensor reasonably or adequately in the event that the Licensee breaches its obligations. The Licensee therefore expressly agrees that the Licensor is entitled to injunctive and other equitable relief in the event of such breach or threatened breach. This relief is in addition to any other rights or remedies, which the Licensor may possess.

Leafloor Decl., Exhibit B, § 8(b).

**The Addendum**

In 2016, HHS issued a request for proposal ("RFP") for an automated privacy data and audit surveillance system to be used to monitor its employees' access to medical records that are

5

168435464.2

available through a database management system named ClinicalConnect.  Compl. ¶ 10.  ClinicalConnect is a secure, web-based portal that allows authorized healthcare providers to access patients' electronic medical records in real time.  *Id.*  ClinicalConnect connects information systems across multiple healthcare facilities and locations.  *Id.*

Iatric submitted a response to the RFP on or about June 23, 2016.  *Id.* ¶ 11.  As part of its response, Iatric proposed to amend the MLA to include Iatric's Security Audit Manager solution ("SAM") – a software application that monitors patient data and audit logs; analyzes, identifies, and alerts on potential privacy breaches; and facilitates the management of incident risk.  *Id.* ¶ 11.

Consistent with the RFP, Iatric proposed a single license to a single user and priced it accordingly.  *Id.* ¶ 12.  In various instances, both directly and indirectly, the proposal indicated that Iatric only intended to provide a single license to HHS.  *Id.*

On or about July 27, 2017, the parties executed the Addendum to the MLA, which licensed SAM to HHS.  *Id.* ¶ 13.  The Addendum specifically provides that Iatric is granting HHS a limited, nonexclusive, nontransferable license to use the software and *HHS' hospitals and facilities*.  In particular:

> Licensor grants to Licensee a limited, nonexclusive, nontransferable license to use the Software exclusively on its current HIS Version configuration, at its hospitals and facilities ("Licensed Facilities") and on the databases ("Licensed Databases") listed in the Business Terms.  Licensee is prohibited from making copies of the Software except backup.  Licensee agrees that it will not reproduce the Software for any other purpose. . . . Licensee shall use the Software and any component files thereof (i) only as a commercial item (as such term is defined therein) and (ii) with only those rights as are granted pursuant to the terms and conditions hereof.

Leafloor Decl., Exhibit A, § 3.  The only "Licensed Facility" listed in the Business Terms of the Addendum is "Hamilton Health Sciences Corporation."  *Id.* at Business Terms.

Significantly, the "Licensee Entities" are defined by the MLA as "entities controlled by the Licensee Signatory [HHS] and listed on the Cover Page or applicable addenda and expressly

6

168435464.2

excludes any entities that control the Licensee Signatory or are under common control with the Licensee Signatory [HHS]." Compl. ¶ 16; Leafloor Decl., Exhibit B, § 2(e). The cover page to the MLA lists "Hamilton Health Sciences" as the only licensee and the Addendum did not add any additional licensees or facilities. *See* Leafloor Decl., Exhibits A and B.

In October 2020, SAM was rebranded Haystack iS. Compl. ¶ 22. Accordingly, the MLA and Addendum grant HHS a single license to Haystack iS. *Id.*

### HHS Breaches Its Contractual Obligations and Misappropriates Iatric's Confidential, Propriety Software

Despite the limits and scope of its license, HHS has permitted unauthorized users to access and use Haystack iS. Compl. ¶ 23. More specifically, HHS has allowed members of the ClinicalConnect network to access and use Haystack iS and related documentation without paying licensing fees or requiring them to use procedures and mechanisms necessary to protect Iatric's Confidential Information as required by the MLA. *Id.* In fact, HHS has provided unauthorized access to Haystack iS to at least 2,176 unlicensed entities, all without obtaining approval from Iatric or paying required fees under the MLA and Addendum. *Id.* HHS transmitted Haystack iS to these unlicensed facilities through a link contained on its online publication of a document titled "ClinicalConnect Program Support Services Reference Guide." *Id.* ¶ 23.

## LEGAL STANDARD

A complaint will survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss where it states a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The factual allegations must be enough to "raise a right to relief above the speculative level," even where the allegations appear doubtful in fact. *Id.* at 555 (citations omitted).

When evaluating HHS' Motion, this Court must read the Complaint in the light most favorable to Plaintiff. In so doing, the Court must accept as true the factual allegations set forth in

the Complaint and draw all reasonable inferences in Iatric's favor. *See TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc.*, 215 F.3d 172, 175 (1st Cir. 2000) (reversing allowance of motion to dismiss).

As the U.S. Court of Appeals for the First Circuit has observed, a motion to dismiss will lie only where "based on the factual scenario on which the case rests, the plaintiff could never win." *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014); *see also New England Gen-Connect, LLC v. US Carburetion, Inc.*, No. 16-12270-GAO, 2017 WL 4364176, at *1 (D. Mass. Sept. 29, 2017) (observing the purpose of a Rule 12(b)(6) motion is "to test the sufficiency of the statement of a claim for relief; it is not a procedure for resolving the facts or merits of a case"). For this reason, a plaintiff (here, Iatric) need not demonstrate that it stands a likelihood of prevailing on its claims, only "whether discovery can reasonably be expected to fill any holes in the pleader's case." *See García-Catalán v. United States*, 734 F.3d 100, 103-05 (1st. Cir. 2013); *see also Grampp v. Bordynuik*, No. 13-11906-MLW, 2015 WL 5609958, at *1 (D. Mass. Sept. 22, 2015) (observing the issue before the court is not whether the plaintiff will prevail, "but whether they are entitled to offer evidence to support their claims").

## ARGUMENT

**A.     Iatric Has Properly Plead its Claims Under DTSA and MUTSA.**

The elements of a claim under the DTSA and MUTSA are essentially the same. Under both the DTSA and MUTSA, Iatric must allege facts that meet three (3) elements: (1) the information in question constitutes a trade secret; (2) Iatric took reasonable steps to preserve the secrecy of the information; and (3) HHS used improper means, in breach of a confidential relationship, to acquire and use the trade secret. *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see also Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d

8

89, 94-95 (D. Mass. 2019) (observing federal and state misappropriation of trade secret standards are equivalent); *J.T. Healy & Son, Inc. v. James A Murphy & Son, Inc.*, 357 Mass. 728, 737-39 (1970) (outlining Massachusetts standard).

Despite HHS' contentions, Iatric has properly alleged the existence of a trade secret, that it took reasonable measures to protect the trade secret, and that the trade secret was misappropriated.

          i.    *Existence of a Trade Secret*

As an initial matter, HHS' Motion suggests imposing a higher pleading burden on Iatric than is required by the Federal Rules of Civil Procedure, the DTSA, or MUTSA.

Trade secrets are subject to Rule 8(a)'s notice pleading standard (*i.e.*, they are not required to be pleaded with particularity). Though in the course of trade secret litigation the trade secrets at issue must be identified with specificity, that does not increase the initial pleading burden. *See Mktg. Alliance, Inc. v. First Am. Ins. Underwriters, Inc.*, No. 05-12046-REK, 2006 WL 8458338, at *3 (D. Mass. Jan. 25, 2006) (denying motion to dismiss). All that is required now – which Iatric has already done – is the submission of a short and plain statement of the claim showing an entitlement to relief. *See id.* (reasoning that, so long as the court can determine the plaintiff has alleged a trade secret in its complaint, plaintiff has met its pleading burden).

Here, Iatric has alleged that Haystack iS, including, but not limited to, its coding and related documentation, are a trade secret. Compl. ¶¶ 31, 37; *see also* 18 U.S.C. § 1839(c), (defining "trade secret" to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information, including . . . programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . ."). In fact, through the MLA and Addendum, HHS

9

acknowledged and agreed that it was receiving limited access (*i.e.*, a single license) to the software which was subject to confidentiality terms and other provisions that restricted use and distribution. *See* Compl. ¶¶ 13-22; *see also* Leafloor Decl., Exhibit B, §§ 4(c), 8(a) (granting a single software license while also prohibiting HHS from taking any inconsistent action with Iatric's copyright and trademark ownership and imposing strict confidentiality and nondisclosure duties). The fact that the software is proprietary, and that HHS was strictly prohibited from granting access to any entities not contemplated by the MLA and/or Addendum sufficiently demonstrates the existence of a trade secret. *See Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 106 (D. Mass. 2001) (finding plaintiff presented a viable misappropriation of trade secrets claim where the licensing agreement at issue made clear the plaintiff's software was proprietary and confidential); *see also KPM Analytics North America Corp. v. Blue Sun Scientific, LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *13-14 (D. Mass. Jul. 15, 2021) (denying motion to dismiss claims under DTSA and MUTSA where only portions of the information at issue constituted a trade secret); *Baystate Technologies, Inc. v. Bentley Systems, Inc.*, 946 F. Supp. 1079, 1090 (D. Mass. 1996) (noting that trade secret protection "is afforded to computer software so long as the matter sought to be protected is not generally known in the industry").

Indeed, HHS has long been placed on notice of the secrecy of the information at issue. *See J.T. Healy & Son, Inc.*, 357 Mass. at 738 (reasoning trade secret protection requires a "warning" to those it is disclosed to, preferably in the form of an agreement "acknowledging its secrecy and promising to respect it"). HHS cannot reasonably have agreed to the terms of the MLA and Addendum, which expressly lay out the confidential and proprietary nature of the software while strictly prohibiting its disclosure, and then claim that no trade secret is alleged. *See Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30-31 (D. Mass. 2004) (reasoning,

10

where parties were subject to a confidentiality agreement, defendant "cannot now claim surprise or unawareness of [plaintiff's] intention to conduct a wholly confidential exchange").

In sum, HHS is keenly aware of the trade secrets claimed by Iatric and now feigns ignorance of the very proprietary information it was under strict duties to protect.

ii. *Reasonable Measures*

Iatric has adequately pled that it took reasonable measures to preserve the secrecy of its trade secrets, and the MLA's confidentiality and nondisclosure provisions confirm that. *See* Compl. ¶¶ 20-21; Leafloor Decl. at Exhibit B § 8.

The standard here is "reasonableness, not perfection," and a company need not take "heroic measures" to preserve the confidentiality of its trade secrets. *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (*quoting USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 101 (1979)); *see also TouchPoint Solutions, Inc.*, 345 F. Supp. 2d at 30 (same). Numerous courts, including several circuits, have accordingly accepted the existence of a confidentiality agreement as a key factor in establishing reasonable measures to protect trade secrets. *See, e.g.*, *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (observing the "reasonableness analysis will often focus . . . on the importance of confidentiality and nondisclosure agreements to maintaining secrecy"); *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (holding that under the DTSA, a company "without a confidentiality agreement and without other policies or practices for safeguarding secrets" did not take reasonable steps to safeguard its trade secrets); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020) (holding, under the DTSA, that "[c]onfidentiality provisions constitute reasonable steps to maintain secrecy"); *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 179 (D. Mass. 2023) (denying motion for summary

11

judgment as to plaintiff's DTSA and MUTSA claims where the information was subject to an express agreement restricting disclosure); *Touchpoint Solutions, Inc.*, 345 F. Supp. 2d at 30-31 (finding plaintiff was likely to succeed on the merits of its misappropriation of trade secrets claim, reasoning "the [confidentiality agreement's] existence is some evidence of reasonable security measures"); *J.T. Healy & Son, Inc.*, 357 Mass. at 738 (reasoning trade secret protection preferably requires a written agreement "acknowledging its secrecy and promising to respect it").

Accordingly, HHS' contention that the Complaint is "bereft of any description of the steps Plaintiff took to keep its poorly defined trade secrets confidential" is without merit. *See* Motion at 9; *see also Bruno International Ltd. v. Vicor Corp.*, No. 14-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015) (denying motion to dismiss misappropriation of trade secrets claim, reasoning plaintiff's "specific request that [defendant] keep the information confidential is sufficient, on the pleadings, to allege that [plaintiff] took reasonable, affirmative steps to protect its trade secrets.").

iii.   *Misappropriation*

HHS' argument that Iatric has failed to allege an act of misappropriation also fails.

The language of both the DTSA and MUTSA expressly provides that disclosure of trade secrets in violation of a confidentiality/nondisclosure duty constitutes misappropriation and improper means. *See* 18 U.S.C. §§ 1839(5)(B), (6)(A) (defining "misappropriation" as including "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[,]" and "improper means" as including "breach or inducement of a breach of a duty to maintain secrecy"); *see also* M.G.L.

c. 93 § 42(1-2) (containing similar language and defining "improper means" as including "breach or inducement of a breach of a confidential relationship or other duty to limit acquisition[.]"). That is what happened in this case.

Iatric's Complaint sets forth allegations that HHS has allowed no less than 2,176 unlicensed entities to access Haystack iS in violation of the confidentiality provisions of the MLA and Addendum and without necessary mechanisms to maintain the security of the confidential information. *See* Compl. ¶¶ 20-23. "As a matter of law, an individual who breaches contractual duties . . . [concerning] trade secrets has used improper means." *Optos*, 777 F. Supp. 2d at 240 (*citing Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994)); *see also Draftkings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 119 (D. Mass. 2024) (finding plaintiff likely to succeed on the merits of its DTSA and MUTSA claims where defendant breached his contractual obligation to maintain the confidentiality and nondisclosure of the trade secrets at issue).

Iatric has clearly alleged that HHS used improper means, by publishing the software to ClinicalConnect users, in direct violation of its confidentiality and nondisclosure agreement under the MLA. *See* Compl. ¶¶ 20-23; Leafloor Decl., Exhibit A § 3 (prohibiting HHS from reproducing the software for any other purpose except backup and that the use of the software is subject to the rights in the MLA and Addendum); Leafloor Decl., Exhibit B § 8(a) (requiring HHS to hold Iatric's confidential information in "strict confidence," prohibiting disclosure, and mandating that HHS implement proper security measures to protect confidentiality). These are precisely the facts needed to demonstrate misappropriation under DTSA and MUTSA. *See Allscripts Healthcare, LLC*, 386 F. Supp. 3d at 94-95.

There is no reasonable argument that the MLA and Addendum did not place HHS in a confidential relationship or place a duty on HHS to maintain the secrecy and limit the acquisition and use of Haystack iS. The Complaint's allegations set forth that HHS breached the confidential relationship by disclosing the software to unlicensed entities. *See* Compl. ¶¶ 20-23; *see also* Leafloor Decl., Exhibit B, § 8. Iatric has thus sufficiently pled misappropriation.

**B.      The Economic Loss Rule Does Not Bar Iatric's Common Law Misappropriation Claim.**

The fact that HHS' misappropriation of Iatric's confidential information breached the terms of the MLA and Addendum does not bar Iatric's common law misappropriation claim under the economic loss rule. That rule establishes limitations on damages a plaintiff may plead and recover in a negligence action. *See Wyman v. Ayer Properties, LLC*, 469 Mass. 64, 69 (2014).

HHS cites to no case law, and Iatric has not located any, holding that a misappropriation of confidential information claim is barred by the economic loss rule by virtue of contractual obligations between the parties. On the contrary, the economic loss rule is subject to the provisions of the contract at issue, and case law suggests that a negligent breach of contractual obligations, causing damage, is not barred by the economic loss rule. *See Johansen v. Liberty Mutual Group, Inc.*, No. 1:15-cv-12920-ADB, 2016 WL 7173753, at *10-11 (D. Mass. Dec. 8, 2016) (rejecting application of economic loss rule to negligence claim, reasoning Massachusetts law carves out tort claims to recover economic losses stemming from the negligent breach of contractual duties); *Arthur D. Little Intern., Inc. v. Dooyang Corp.*, 928 F. Supp 1189, 1202-03 (D. Mass. 1996) (recognizing same and observing that applicability of economic loss doctrine is subject to the terms of the contract).

Indeed, misappropriation of trade secrets and confidential information has been held to be "actionable independent" of a party's contractual obligations of confidentiality and nondisclosure.

14

*See Specialized Technology Resources, Inc. v. JPS Elastomerics Corp.*, 80 Mass. App. Ct. 841, 847 (2011). Assessment of damages resulting from misappropriation is further not a purely economic inquiry. *See Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 172 (1979) (observing that the economic value of misappropriated trade secrets does not form the basis of the plaintiff's recovery and instead must focus on the wrongful conduct of the defendant). Moreover, the terms of a contract can explicitly carve out the applicability of the economic loss doctrine. *See Szulik v. State Street Bank and Trust Co.*, 935 F. Supp. 2d 240, 270-71 (D. Mass. 2013) (holding that, as the contract at issue specifically excluded claims for negligence, it would be "improper" to apply the economic loss doctrine to dismiss plaintiff's claims) (citation omitted).

Here, HHS specifically agreed pursuant to the terms of the MLA that Haystack iS has a "special value, and damages alone in an action at law cannot compensate" Iatric if HHS breached its confidentiality obligations. *See* Leafloor Decl. at Exhibit B § 8(b). Accordingly, HHS has already agreed that a breach of its confidentiality obligation cannot be remedied by damages alone, such that a misappropriation claim does not seek "purely economic damages" compelling the application of the economic loss rule. *See Szulik*, 935 F. Supp. 2d at 271.

**C.     Iatric Should Be Given Leave to Amend to Cure Any Pleading Deficiencies.**

Iatric rejects HHS' contention of pleading deficiencies and asserts that the Partial Motion to Dismiss should be denied on that basis. However, if this Court were to determine that Iatric's Complaint is deficient in one or more regards, then this Court should afford Plaintiff leave to file an amended pleading. *See* Fed. R. Civ. P. 15(a)(2) (providing that the court "should freely give leave when justice so requires"). As Iatric would be amending its Complaint just months after commencing this action and in the context of HHS' Motion to Dismiss, any amendment would be timely, there would be no prejudice to HHS, and the amendment would not be futile. *See Amyndas*

*Pharmaceuticals, S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 42 (1st Cir. 2022) (vacating denial of plaintiff's first attempt at amending complaint).

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should DENY HHS' Partial Motion to Dismiss. Alternatively, the Court should grant Iatric leave to file an amended pleading.

    Respectfully submitted:

    IATRIC SYSTEMS, INC.,

    By his attorneys,

    _/s/ Kevin T. Peters_
    Kevin T. Peters (BBO No. 550522)
    Ari N. Stern (BBO No. 672442)
    Thomas M. Brown (BBO No. 710665)
    Fox Rothschild LLP
    33 Arch Street
    Suite 3110
    Boston, MA 02110
    (617) 848-4017 - direct
    (617) 848-4001 - fax
    kpeters@foxrothschild.com
    astern@foxrothschild.com
    tmbrown@foxrothschild.com

Dated: February 20, 2025

168435464.2

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on the date below.

_/s/ Kevin T. Peters_<br>
Kevin T. Peters

Dated: February 20, 2025

168435464.2